is 13-1682, Finjan v. Symantec. Mr. Andres. Good morning. May it please the Court. There were several issues regarding validity of the two patents that were raised in our brief. For this morning's argument, I'd like to focus on the issues of validity on the 194 patent, the Gateway patent. And this is because I believe that is the most egregious example of the District Court affirming a jury verdict without substantial evidence. In fact, in order to sustain that verdict, the District Court engaged in improper post-trial claim construction and also made several misstatements of evidence because of a fundamental misunderstanding of the technology in the case. We turn to the first piece of prior art I want to talk about, the Sweep Intercheck. This is the only piece of prior art that was used to show anticipation of the 194 patent. If you look at how the Sweep Intercheck works, you'll see one glaring omission from the prior art. There's no gateway. On page 38 of our brief, we provide a graphic of how this technology works and you'll see that the downloadable or the executable file is introduced directly to the client computer. There's no gateway between... I understand that you're telling us that now, but as I recall in the briefs, and there are lots of issues here and lots of questions of obviousness and anticipation, that there was testimony that did say there was a gateway, right? Actually, there was not. This is one of the issues I believe that the District Court had a fundamental misunderstanding. He relied on two pieces of fact testimony. One from Dr. Herska, and that's at JA 8107, in which I was doing cross-examination with Dr. Herska and asked him if, in fact, the executable was downloaded directly to the client computer. He said no, and that's the testimony that the District Court relied upon. If you look at the next series of questions, I clarified that. I didn't think I understood the question. I asked him, I said, now, it is downloaded directly to the client first and then sent to a server computer afterwards. He agreed with that. So the fact of the matter is, the testimony that the District Court relied upon was contradicted in the very next two questions and answers that were provided by Dr. Herska. What about the MySweeper Administrator's Guide that was introduced that showed that the MySweeper product had an email gateway? That's for the obviousness determination, not the anticipation that I'm talking about now. In that particular instance, they actually had a gateway product on the MySweeper, but they didn't use the technology other than the fact that it was a gateway product, but they tried to combine that with a client-side antivirus program to show obviousness. Going back to the anticipation, the District Court also relied on Mr. Twait's testimony, another fact witness. And if you look at the testimony we enlisted from Mr. Twait's on cross-examination, that's at JA8113, I actually went through and had him admit that there was no gateway, that in fact the executable and downloadable could go directly to the client and could actually execute. Can you want to give us the site to that 8113 you said? Yes, 8113. That's the site to that. Yeah, but there are four pages here and I don't know what lines you're talking about. The page and line number begins at 2396, that's on the right-hand side of the page, line 19, and it goes down to the end of 2397. Mr. Twait admitted during that testimony that in fact there was not a gateway sitting between the client and the executable coming into the client. So that's the only two pieces of evidence the District Court relied upon that was clearly erroneous relying on that evidence. So in order, because there was no evidence to support that there was in fact a gateway for the sweep intercheck product, the Court then engaged in some post-trial claim construction in which it said it was not necessary to have a gateway separate from the client, you could actually download on the client first as long as it doesn't execute on the client. There's nothing to support that claim construction. I believe this Court can reverse that claim construction to no vote. The proper claim construction is the gateway is a server that serves as a gateway to the client. So in order to agree with you on anticipation in terms of what the evidence was, we have to agree with you on the claim construction and we have to reverse the District Court's claim construction. But did the parties ever, there was no claim construction dispute on this issue? There was not. Was everybody just saying ordinary meaning? It was ordinary meaning. And then that ordinary meaning was used throughout the entire case from the marking proceeding all the way through the trial. And it only came up for the very first time in the post-trial briefs, this new claim construction that came up regarding this gateway term. That some way the gateway was not something that sit between the client and the executable. But in fact, the gateway could be something that would, after the fact, which doesn't make sense at all. The fact of the matter is, in this product with the gateway, there is no evidence whatsoever to support that there is a server that serves as a gateway to the client. And the only way you can get there is if you do this modified claim construction. And even with that modified claim construction, you'll see the testimony of Mr. Twaits and even of their expert that the executable can actually execute on the client without ever going to the sweep server. So it's not even a gateway under that claim construction. Even if we were to agree with all of the arguments you've made thus far, you're still left with an obvious determination on the same path, right? Absolutely. And Judge Rayna was alluding to the Minesweeper. Why don't you talk to us about that? Okay. Well, as I said, the Minesweeper is a gateway product. It is something that sits on the gateway and does monitor emails. What the defendants in this case did was try to combine that product with a client-side product, which is the Thunderbyte. And Thunderbyte has two different programs. It has an antivirus program, and it has a heuristic scanning program as well. There's two different programs here. They used a combination of the two because a press release that came out for Minesweeper said it had an interface that could work with a bunch of antivirus programs. In other words, you could combine the gateway to this client. Right. And the jury heard all of this testimony, and they were free to discount or not believe your witnesses and to credit the other side's witnesses. So I'm having a hard time seeing how there's not enough evidence on the record to sustain the jury. Well, with respect to the Thunderbyte, there was uncontested evidence that the Thunderbyte product cannot run on Windows NT operating system, and the Minesweeper runs on a Windows NT. The heuristic program of the Thunderbyte was tested on a Windows NT system. It was inoperable. So they took one piece of the Thunderbyte, the antivirus, and tried to combine that with the Windows NT. That's fine. If you do the heuristic scanner, it doesn't work. The jury heard that evidence from our expert with testing of that, and they just discounted. Largely, in fact, due to the part that they discounted our expert. Well, you're right. I mean, I think there's stuff to suggest, and obviously I wasn't on the jury, but there certainly was evidence to suggest that your expert's testimony should be discounted, including during cross-examination when they acknowledge they've never even seen or been provided with the Minesweeper. So assuming that the jury failed to credit any of the testimony of your expert, where is there sufficient basis for us to overturn? The mere fact that there was not clear and convincing evidence that you could combine these two. A press release saying that you can combine an antivirus program on the client side with an email scanner on the gateway, that's not sufficient evidence. We had a patent that has a gateway technology. To say that somehow you would take an antivirus program from the client side and put it up on the gateway as a gateway monitor wouldn't be enough. They never made any testimony whatsoever, never provided any testimony that a heuristic scanner of Thunderbite could be placed on the Minesweeper gateway. Now, going back to the Minesweeper, it is true that we didn't have access to it. The Minesweeper, no one had access to it. The defendants didn't have access. This product is gone from the market. The fact of the matter is, it was put forth on paper only. So we couldn't test the Minesweeper, but we knew the Minesweeper, based on the product details, runs it on a Windows NT operating system. So we took the Thunderbite heuristic scanner and applied that to a Windows NT operating system and it just didn't work. It was inoperable. So that should have been credited, but if it wasn't credited, there are other issues as well. For example, Thunderbite doesn't make any mention in the district court knowledge list of scanning the JavaScript or the Visual Basic script. Now, these are dependent claims we have. This is a certain type of scripting language. It was introduced when the internet went public, or non-commercial, about 1995. This is before this technology came out. The Minesweeper technology doesn't make any mention of scanning that type of language. In fact, it couldn't. So there was a single bit of testimony where the defendants expert said, well, it would have been obvious to make the modification to the Thunderbite to make it scan this language. But that's all he said. There was no basis for saying that that would have been obvious or it was ever done. In fact, I don't think it ever was done. There's no evidence that it was ever done. So you're making an obvious determination with hindsight looking back with 2020 saying, yeah, you could have done that, but there was no basis to do so at the time of the invention. There's also the issue of the press releases. Let's go back. Doesn't the Thunderbite manual indicate that you can specify additional file types? This is including the Java and the Visual Basic Scripts? Not the manual, not at all. Actually, the manual itself doesn't make mention of Visual Basic Script or JavaScript. And that was admitted to by the defendants and by their expert in that trial. But they were both well-known at the time of the invention. At the time of the invention, and actually the invention mentioned Visual Basic Script and JavaScript as well. Obviously, it wasn't put into the Thunderbite manual, but those languages were well-known. That's correct. So the idea of taking something in a DOS-based system and having that read a scripting language is not obvious at all, and there was not sufficient evidence provided to the jury to do so. Doesn't the Minesweeper manual tell us the interaction between the two products? The manual does. There's a press release that was put out for the Minesweeper that says that they could interact with different antivirus programs. It never talks about that you could interact with the heuristic scanner. It's just the antivirus program. They listed five antivirus programs in which these parties could interact with. You're into your rebuttal. I'll save it. Thank you. Now you're splitting your time? Yes. My co-counsel, we had multiple defendants. I represented Symantec in the case. Are you all covering all issues, or have you divided up what issues you're going to be speaking to? The sweep intercheck will be covered by my co-counsel, and then I'll take care of the rest of the issues, Your Honor. So thank you. My name is Dave Nelson. I represent Symantec in the appeal. May it please the Court. I think if you look at page 3 and 4 of the reply brief, you really see what the issue is and what they're trying to do here. What they've done, and I think you heard during argument, was to go through and say, we have a bunch of unresolved claim construction issues. These are things that the district court should have decided and didn't, but that's not what happened at all. What happened is we had a Markman hearing. There were claim constructions presented, and the district court made rulings on all of the claim constructions that were presented by the parties. In fact, I think Finjen won all the claim constructions, as I recall. Now, what Finjen's pointed to, if you look at the first column, is, well, here's where we raised it at trial, but every single one of those citations is a citation to the testimony of its expert, testifying why a certain element was not present in the prior art. So what we're doing here, or what Finjen's trying to do, is take what are factual issues, the application of the, in this case, the prior art, to the construed claims, and say, well, I disagree, and my expert said this wasn't there. Therefore, it was a claim construction issue, right? And that's not right at all. We don't even need to get to whether there's a waiver issue and who stipulated to what, who proposed certain claim constructions, because if we look at some of the court's recent cases on exactly this issue, the Verizon versus Cox Communication case, the Function Media versus Google case, that's exactly what we have here. We have a situation where a party's coming in after the fact, didn't present any claim construction issues to the district court, didn't say, well, a gateway, it's got to be this particular type of computer. A database has to be this particular kind of thing. It can't be a flat file that stores a number of pieces of information. Never raised those. Never raised them to district court. In fact, what their expert did, perfectly happy with the claim construction, in fact, most of these were presented, to the extent there were constructions, were proposed by Fingen, and then the jury disagreed with those. And now they want to come in and say, court, you should look at this de novo. You should determine, as a matter of law, that the claim should have been construed this way. Well, we can't try cases like that. I mean, you come in on appeal and everything would be a question of law. Let's just come in and look at it again and say, well, did I disagree? If I was sitting as a district court and if they would have raised this to me, would I have done it differently? So that, I believe, is problematic of this entire appeal because now what we get to is what we really should be talking about, is there substantial evidence, sufficient evidence by which a reasonable jury could have found clear and convincing evidence, and there absolutely is. So... How can we reconcile the verdict of non-infringement and invalidity? So that's on the Sophos piece, but I can address that, Your Honor. So on that, we have a situation where, one, the prior art were earlier products, right? They were earlier products that did... that the evidence was presented and provided and source code was presented, that they did certain things. And so they're on the infringement side now. Fingen has the burden approved to show that the current products infringe those particular products. And they say to admissions made by counsel on your side that, in fact, there was infringement, that the product was covered by the past, right? What he said is we've always... I believe that was in closing argument, and I believe what was said was that we've always done this. I think we're... I'm paraphrasing a little bit, but that, I believe, is what Your Honor's talking about. But the issue is, what Fingen's trying to do here is to say, well, wait a minute. We're relieved of our burden of proving infringement because you have said you've always practiced these things. Now what Sophos did is presented evidence through expert testimony, through testimony of factual witnesses, through source code of what the earlier products did, the prior art products, how those things function. The jury credited those witnesses. The jury believed that testimony from the experts, from the fact witnesses, and decided that, yes, each and every element of those asserted claims was found in those products. The jury... Was the jury verdict a special form or general form verdict? It was a general form verdict. At least I would call it a general form verdict. It did not go through and have issue by issue. So, for example, in the validity piece with the prior art, it was a general statement. Are the claims anticipated? Would they be obvious? Not going reference by reference, which I think is Your Honor's question. So, the... But on the infringement side, then, finging isn't relieved of its burden because of counsel's statement. They still have the burden to prove that the products, the current products, that they accuse of infringement meet each and every element of those claims.  necessarily mean that there was infringement here as well? With respect to the Sophos products. Right? Let me just clarify. This doesn't have anything to do with the Symantec products. The Symantec... There's not even an issue, not an allegation. Totally different products function in a completely different manner. In fact, not even the asserted claims overlap completely with respect to those products. So, that particular issue is only with respect to the Sophos products. There's not even a request from finging that with respect to Symantec there be a new trial. What about the exclusion of testimony of the experts? Is that your issue or your friend's issue? That's my issue. Okay. There was nothing wrong with that at all. Certainly nothing that rises to the level of prejudice. See, what happened here is everybody, every expert, the witness that got up on that stand testified that the source code was the DNA. You look at the source code, that tells you... Why shouldn't they have an opportunity? I mean, they had a witness. He had something to say to the court. He was talking about machine code because he couldn't talk about source code. He obviously thought that that was relevant, germane. And why shouldn't they have the opportunity to present that? He did have the opportunity to present that. Where the district court cut him off is that he was going in to testimony to offer an opinion that was found nowhere in the reports and had not been offered at any time prior to the case saying that looking at machine code, assembly code, actually creating the assembly code from the machine code process that's called disassembling, is better than looking at source code. That was what he was trying to do was to introduce that in the guise of rebuttal testimony and when the district court... Is that binary code just as accurate as the source code? I mean, I can tell you in practice they absolutely... No, otherwise people wouldn't be looking and we wouldn't have all these fights and protective orders to get access to the source code. The source code is what humans can read and can tell, I mean, certain trained humans, but the process of disassembling and trying to get back... I don't mean accurate in terms of better than the source code. I mean that the binary code is accurate in and of itself. Well, here's the problem. The binary code... Why didn't the expert testify to that? He did, and he was allowed to testify that in his direct testimony, that he looked at that and that's how he determined and that's accurate. What he wasn't allowed to testify to was that that process of disassembly and looking at the binaries is better than source code because the judge, contrary to what every expert had testified to that jury... Is that really what went down here? I mean, he did testify on direct. It sounded to me like the district court kind of ignored the fact that he had testified it on direct and kind of thought that they were coming out on redirect trying to enter this whole new thing about machine code and that was nowhere else in the trial. And that's not the way things went down, right? Yeah, that's not the way things went down. What the district court was incensed about and what the objection was about was this new idea, contrary to what everyone had testified to at the 11th hour... But he had come in on direct already. That was the problem. No, no, but what he said on direct is I looked, I disassembled, I looked at the binaries and I created the assembly code. He allowed him to testify to that. That's fine. Whether that happened as a factual matter, the jury can credit or discredit that. What the objection was and what the judge was incensed about with respect to the redirect testimony was the expert now, contrary to what every expert in the case had testified to, was that looking at the binaries and doing this process of disassembly is a better practice, is a better way to determine what the code does. Because of that, the judge said, that's just there to confuse the jury. This is a new concept. This is contrary to what everybody... What's wrong with that? There had been already testimony that the source code was a DNA of what a machine does and a system. What's wrong with the expert testifying, no, in my view, the binary code is just as accurate. I testified to that on direct. And now on redirect, I think that it's the same or better than the source code. Well, he himself had testified that it was the DNA earlier in the trial as well and agreed with that. The problem with doing it is that now, here right before the case is going to go to the jury on rebuttal when the defendants don't have the opportunity to put up additional witnesses, because remember, our case is done, basically, at this point in time. It's just there to confuse the jury.  in the idea that, well, wait a minute, what this guy did was better. Now, that's what I'm hearing, and I didn't hear these other experts. Of course, he couldn't hear the other experts. That left the jury without any competing thoughts on that particular opinion that the source code was a DNA of the analysis. Well, there was no competing opinion prior to this time. That was the problem, and that's where the confusion came from. But we still, in order to get to the level of a new trial, we have to say that this event, because there's always going to be issues that a district court does and makes a determination that something is going to, a 403 type determination, more likely to confuse the jury. And it isn't the standard that every single one of those is a situation where, well, if I think the district court got it wrong, then I'm going to reverse and have a new trial. Well, this was pretty significant in terms of how things went down. This was their principal witness, right? And he had no access to the source code, so everything he said was based on the machine code, and that was a substantial portion of their case writing. Well, according to everything prior in that case, everything prior to that time in the case, everything that he had was based upon operating, running the machine code. This idea that somehow he disassembled, which is a very complex process, and frankly doesn't work very well, that just came up out of the blue on the rebuttal. So the answer is that they did have that opportunity. What they didn't have the opportunity to do was offer the opinion that it was better than looking at the source code. I thought the judge said that no one has testified about the binary code, and that's why he prevented the expert from the testimony. Yeah, in context, though, no one has testified about the binary code being the primary source of information about how that program is operating. But that's their case. He didn't have access to the source code. He only had access to the binary code. Which was their own choice. I mean, they were the ones that decided to use an expert who couldn't sign on to the protective order, or wouldn't sign on to the protective order. Didn't that leave the jury just with evidence concerning the source code and not the binary code? No. It kind of made the case for them, didn't it? No, it didn't, Your Honor. I mean, I understand what you're saying, but what he testified to, and this is what the real focus of the case is, what do these products do? What is the operation? The source code was there, and in certain isolated instances where the experts looked at that to offer the testimony, that I went to the source code to confirm exactly what's going on under the sheets, so to speak. But the real primary focus of the evidence in the particular case was this is how the products operate. In fact, with respect to the Thunderbyte and the Minesweeper programs, nobody had source code. So there wasn't any testimony. When we're talking about source code, we're really talking about Sweep Intercheck, and we're talking about MAP-95. We're not talking about the other two products at all where source code wasn't even an issue because nobody had that. All right. We're going to cut you off now because you've consumed all of your friend's time. We'll give him a couple minutes, and then we'll go to the next slide. Thank you, Your Honor. May it please the Court. I'm Sean Cunningham. I represent Sophos, and I will spend my minute wisely. I wanted to respond to a couple of things that Fingen's counsel said about the evidence or lack thereof of whether Sweep Intercheck has this gateway limitation. And I agree with my co-counsel that any suggestion that this is a claim construction issue is one that should have been raised at trial. It was not. There was no objection to anyone's testimony about whether or not Sweep Intercheck had the gateway limitation. But as an additional site's evidence, Dr. Herska, who was the founder of the company and wrote the original Sweep product, the software, was asked directly, what is the function of Sweep in the system? And I'm quoting from JA 8098 at page 2335. Answer, Sweep acts as a sort of gatekeeper because it allows the Intercheck client to block any request to execute it, execute infected programs, or use infected disks. Mr. Twaits testified similarly in his direct examination and confirmed that on his cross. And in the demonstration that we showed the jury, now remember there was a large demonstration in the courtroom where my expert, Mr. Klausner, had the product set up in a traditional gateway configuration with things coming into the Sweep server and then being processed out to two Intercheck clients. And again, no objection. He was able to testify that that was in fact in a gateway configuration. So the jury heard plenty and plenty and plenty of evidence about Sweep Intercheck serving as a gateway to a client. And that testimony by and large came in without objection and the jury credited it very clearly. On the point about inconsistent verdicts, Your Honor, this was something that my co-counsel, my colleague, John Alcock, said in closing. And the question was whether... Essentially the statement was, Sophos has always done it this way. But in fact, we don't agree that that was an unequivocal admission because in every other respect, Sophos disputed infringement. It was in the pretrial order, it was in the jury instructions, it was in the verdict form, and it was evident from the cross-examination of Mr. Twaits. But leaving aside whether or not that was an admission or not, because that wasn't evident, is there not an inherent inconsistency with the jury having found there was no infringement here but also concluding that the patents were invalid? There is not. And the district court has answered that question for us under the abuse of discretion standard by finding that three things. Basically, one, the jury was entitled to discredit Dr. Bromley, a fingered infringement expert, across the board, including in his proof of infringement by Sophos. Two, that his testimony failed to prove the monitoring limitation of the 194 patent. And three, that his testimony failed to prove the comparing limitation of the 962 patent, particularly because he admitted that he'd only reviewed a very small portion of the relevant source code related to that limitation. So the district court has done our job for us here by finding, as a matter of fact, that there were areas where the jury could have found non-infringement while also finding invalidity. Thank you. Thank you. We're going to add two minutes onto the rebuttal to keep things even. Thank you, Your Honor. With respect to what the district court judge said when he excluded that the rebuttal testimony regarding machine code, he talked about, very simply, no expert in this case has talked about binary code, including this gentleman on direct examination. That was plainly and flatly wrong. He had, and he relied upon it. When he shut down our expert on redirecting, he said we cannot talk about binary code, which is the foundation of his opinion for validity. He also shut me down on my closing argument as well. I couldn't bring it up as well. Our expert was ravaged by the fact he did not review source code. And you saw that in the demonstras and during closing arguments. And it was absolutely prejudicial and dispositive to our validity case. The fact that the court went so far to just make that... Suppose we find in your favor on this issue, does that really change the outcome of the case? I think so, Your Honor. I think it... Would we be looking at a harmless error situation here? Your Honor, the fact of the matter is that was such a pervasive issue with respect to validity. I appreciate what a jury does. We're not here appealing the infringement finding. And the standard in the Third Circuit is what? A miscarriage of justice, right? It's against the great weight of the evidence and a miscarriage of justice, yes, that's correct. And it is an abuse of discretion. So it is a high bar, but we think we've met that clearly because even in the closing arguments, when I tried to bring up the fact that he relied on public information, I was shut down in the closing argument as well. So the fact of the matter is that that was a prejudicial error. The fact that the verdict of non-infringement for Sophus, when Sophus' counsel actually said, we have not contended for a minute in this case that our products are not covered by their patents. They are. We did it first. That's what they said. The jury's verdict of non-infringement just goes to the fact that our entire case was discredited by that instruction and the fact that the jury turned against it. They found obvious the 962 patent. There was not an obvious analysis done for most of the claims. There was only one claim in 962 where an obvious opinion was given. The rest was on anticipation in 962. Nonetheless, they checked the box for every single claim on obviousness. And it was clearly, and people reviewed that, and it was clearly the judge had told them, and you didn't object, that they can use the priority on anticipation to also do the obviousness analysis. So, I mean, where did that get to? I believe what the instruction was was the same priority for anticipation can be used for obviousness on the same priority date. But if there's no obviousness analysis, then there's not substantial evidence to actually find it. You can't let the jury find entire legal principle without giving any type of evidence of that sort. Did you raise an objection to this before the jury was dismissed? The fact that you could use the same prior art, the fact of the matter is they did have some obviousness arguments with respect to anticipation arguments with respect to some of the other prior art. Did you raise an objection? I don't know if we objected to that jury instruction. I just don't recall, Your Honor. I don't believe that we did because as a principle of law, it is correct, the same prior art that can be used for anticipation can be used for obviousness. But that doesn't change the fact that the jury can't, on its own volition, go out and find obviousness when there's no evidence to support it. But they also found anticipation, so all we have to do is affirm on anticipation, even if you're right on obviousness. There wasn't sufficiency. We've got anticipation to go on as an alternative. My point on this issue is that because they did find obviousness, it shows that the verdict itself was, on the issue of validity, it has inconsistencies. They found that there was no infringement for the selfish product when they admitted it. They found obviousness when there was no evidence for obviousness. That's the basis for the new trial. The error of excluding our expert testimony, hitting us as hard as they did on the source code issue, had this profound effect on the entire trial. And the jury, as we noted on paper... Let's assume that there was an error made with the inconsistent verdicts. But you failed, it appears to me, that you failed to give the district court the opportunity to remedy that. You didn't object to that before the jury was dismissed, did you? The jury instruction, we're not saying, was incorrect. Because all the jury instruction was... Are you saying that the jury achieved inconsistent verdicts? Yes. And you made no objection to that. What we did in our post-trial briefing, we actually did raise that issue. But that was after the jury had been dismissed. It was a special verdict form, so we didn't have to make the objection at the time. There's no waiver if there's a special verdict form. Mr. Nelson said it wasn't a special verdict form, but actually it's clearly labeled special verdict form. Over our objection, we actually wanted the jury to find a specific prior art, and we objected to the verdict form that they didn't, on the invalidity analysis, tell us which art was going to be anticipatory, which was going to be obvious. We did object to that on the record. But with the special verdict form, we did not have to make the objection before the jury was dismissed. So that's not a waiver of any sort whatsoever. So what happens if we find that this is not a special verdict form, it's a general verdict form? If it was a general verdict form, we should have made the objection. But it's labeled special verdict form. It was our understanding it's a special verdict. We objected to the fact that they didn't call out the actual individual pieces of prior art. But nonetheless, it is a special verdict form. So there was no objection that was necessary on that basis. With respect to the markman process, I didn't want to talk about claim construction in my last 10 seconds. We don't raise every single term of markman. We understand that. There are terms that we dispute and those we agree with. These terms were stipulated to during the markman process. So there's no waiver there whatsoever. Thank you. We thank all commenters for their patience. Thank you very much. We appreciate it.